# IN THE COURT OF APPEALS OF IOWA

No. 13-0903
Filed September 17, 2014

**STATE OF IOWA,**
Plaintiff-Appellee,

**vs.**

**PEDRO OLEA CAMACHO,**
Defendant-Appellant.

_____

Appeal from the Iowa District Court for Muscatine County, Mark D. Cleve (motion to suppress) and Thomas G. Reidel (trial and sentencing), Judges.

Pedro Olea Camacho appeals his conviction. **REVERSED AND REMANDED.**

Kent A. Simmons, Davenport, for appellant.

Thomas J. Miller, Attorney General, Mary A. Triick, Assistant Attorney General, Alan Ostergren, County Attorney, for appellee.

Considered by Vaitheswaran, P.J., and Tabor and Bower, JJ.

**VAITHESWARAN, P.J.**

Pedro Oleo Camacho appeals his judgment and sentence for six counts of second-degree sexual abuse. He contends the district court should have suppressed statements he made to police following his arrest.

### I.    *Background Facts and  Proceedings*

A teenager was admitted to a hospital after overdosing on sleeping pills. When asked why she took the pills, she said she was sexually assaulted as a young child. She identified the perpetrator as Camacho.

A sergeant with the Muscatine County Sheriff's office began an investigation which led to the filing of a complaint against Camacho and the entry of an attorney's appearance on his behalf. On discovering that Camacho did not live in Iowa, the sergeant asked the county attorney what to do. He advised her to continue investigating.

The investigation uncovered similar complaints by the teenager's older sister. Camacho was arrested and returned to Iowa.

On his arrival in Muscatine, Camacho was interrogated at the jail. The interrogation was audio-recorded. The sergeant conducted the interrogation entirely in English. Camacho's native language is Spanish.

After some preliminary questions, the sergeant read Camacho his *Miranda*[1] rights in English. Camacho responded, "Well, I got my lawyer, but I don't know when, when I go to court. I don't know when." The sergeant then

---

[1] In *Miranda v. Arizona*, 384 U.S. 436, 479 (1966), the United States Supreme Court held that a suspect subjected to custodial interrogation must be warned of "the right to remain silent," anything said "can be used against [the suspect] in a court of law," "the right to the presence of an attorney," and if the suspect "cannot afford an attorney one will be appointed . . . prior to any questioning" if so desired.

said, "Okay, Okay. Um, you're willing to talk to me? Yes?." There was no audible answer.

Camacho signed a waiver of his *Miranda* rights and the sergeant questioned him about the sex abuse allegations. During the questioning, the sergeant told Camacho they had DNA samples that implicated him. This statement was false. Camacho provided an explanation of how his semen might have been found on the children. His explanation did not include a confession to the crimes.

At this juncture, the sergeant asked Camacho to draft and sign an "apology" letter. Camacho responded that he could not write English. The sergeant suggested statements for inclusion in the letter, confirmed them with Camacho, and wrote them down. She then read the full statement to Camacho and had him sign it.

Camacho entered an initial appearance the following day. A subsequent order noted his retention of the same attorney who previously entered an appearance.

The State charged Camacho with six counts of second-degree sexual abuse. Camacho moved to suppress the recorded statement and the letter.[2] He asserted the evidence was obtained in violation of his right against self-incrimination and right to counsel guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, as well analogous rights under

---

[2] The motion was untimely, but the prosecutor advised the court that neither he nor defense counsel became aware of the recording until shortly before the motion was filed. For that reason, he did not interpose an objection to the late filing.

Article I, sections 8, 9, and 10 of the Iowa Constitution. Following an evidentiary hearing, the Court denied the motion.

The letter and the recording were admitted during the State's case-in-chief. After the State presented its case, Camacho testified and essentially retracted the explanation he gave during the interrogation. A jury found Camacho guilty of all six counts of second-degree sexual abuse. The district court imposed sentence and this appeal followed.

## I. Suppression Ruling

### A. Fifth Amendment to the U.S. Constitution.

"The *Miranda* warnings protect a suspect's Fifth Amendment right against self-incrimination 'ensuring that [] suspects know[] that [t]he[y] may choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time.'" *State v. Ortiz*, 766 N.W.2d 244, 249 (Iowa 2009) (quoting *Colorado v. Spring*, 479 U.S. 564, 574 (1987)). *Miranda* requires "meaningful advice to the unlettered and unlearned in language which [the suspect] can comprehend and on which [the suspect] can knowingly act." *State v. Blanford*, 306 N.W.2d 93, 96 (Iowa 1981) (citing *Coyote v. United States*, 380 F.2d 305, 308 (10th Cir. 1967)). While no strict formulation is required, the "crucial test is whether the words in the context used, considering the age, background and intelligence of the individual being interrogated, impart a clear understandable warning of all of his rights." *Id.*

Camacho contends that, because English is not his native language, the sergeant should have given him the *Miranda* warnings in Spanish. Reviewing

the totality of the circumstances, including the recording, we agree with the district court that Camacho had

> a very good command of spoken English, and that during the course of the interview he was consistently able to engage in a genuine two-way conversation with [the sergeant] in English, although he does have a heavy Spanish accent which sometimes required [the] [s]ergeant [] to ask him to repeat certain words.

Given Camacho's conversance with the English language, the sergeant had no obligation to use the Spanish translation of the warnings she concededly had in her possession.

Camacho next points to the speed at which the warnings were read to him. We agree the sergeant proceeded through the warnings at a fast clip. But the warnings were clear and intelligible to someone who spoke and understood English and Camacho acknowledged he understood his rights.

We are left with Camacho's assertion that the sergeant should have clarified the scope of his right to counsel after he stated he had a lawyer but did not know when he was going to court. This statement, it is contended, raises doubts about whether Camacho understood he was entitled to the presence of a lawyer "at the jail for questioning."

Absent an unequivocal assertion of a right to counsel, an officer does not have a Fifth Amendment obligation to stop interrogating a suspect. *See Davis v. United States*, 512 U.S. 452, 459 (1994)).

> [T]he suspect must unambiguously request counsel. . . . [The suspect] must articulate [a] desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, *Edwards* [*v. Arizona*, 451 U.S. 477 (1981)] does not require that the officers stop questioning the suspect.

*Id*.; *see also State v. Harris*, 741 N.W.2d 1, 7 (Iowa 2007) (holding suspect's statement, "I don't want to talk about it.  We're going to do it with a lawyer.  That's the way I got to go," was a clear and unequivocal request for counsel); *State v. Morgan*, 559 N.W.2d 603, 608 (Iowa 1997) (holding "I think I need an attorney" insufficient to invoke right to counsel).  When a suspect makes an ambiguous or equivocal request for counsel, the Fifth Amendment does not require an officer to "ask clarifying questions," although these types of questions "will often be good police practice."  *Davis*, 512 U.S. at 461.

Appellate counsel concedes Camacho's statement "certainly did not express an unequivocal decision to have his attorney present at the jail."  In light of this concession, the sergeant had no Fifth Amendment obligation to stop questioning him or to ask clarifying questions before proceeding with questioning.

We turn to whether Camacho's waiver of his right to counsel was knowing, intelligent, and voluntary.  *See Ortiz*, 766 N.W.2d at 252; *State v. Hajtic*, 724 N.W.2d 449, 453-54 (Iowa 2006).  To make this determination, "we must inquire if the suspect knew that he or she did not have to speak to the police without counsel and understood that statements provided to the police could be used against him or her."  *Ortiz*, 76 N.W.2d at 252.

Camacho came to the United States in the early 1980's and, as noted, was able to speak and understand English.  He received accurate and intelligible *Miranda* warnings that he acknowledged he understood, and he signed a waiver of his *Miranda* rights.  Although the officer used deceit, the deception occurred after Camacho waived his rights.  Under the totality of the circumstances, we

conclude Camacho's waiver of his *Miranda* rights was knowing, intelligent, and voluntary.

### B. Article I, Section 9 of the Iowa Constitution

Camacho next contends Article I, section 9 of the Iowa Constitution requires "a meaningful conversation . . . between the officer and detainee," including an explanation that "the suspect has a right to have counsel present before and during police interrogation." The Iowa Supreme Court addressed this issue in *Morgan*, as follows:

> As a final challenge to the confession evidence, Morgan asks this court to impose, under the due process clause of the Iowa Constitution, a requirement that police must ask clarifying questions when faced with an equivocal request to consult with counsel and that suspect interrogations must, where feasible, be recorded. Requiring law enforcement personnel to record interrogations or to ask such clarifying questions are issues that may be argued both pro and con as matters of public policy. We are confident, however, that such procedures are in no way mandated by any provision in the Iowa Constitution. We reject Morgan's contention that they are.

*Morgan*, 559 N.W.2d at 609. *Morgan* is controlling.

Camacho acknowledges *Morgan* but cites a special concurrence in *State v. Effler*, 769 N.W.2d 880, 897 (Iowa 2009), characterizing *Morgan* as "wobbly precedent that may not survive a direct attack."

*Effler* does not overrule *Morgan*. Addressing a challenge to the district court's denial of a motion to suppress a confession, the opinion failed to garner a majority of votes. Because six justices were equally divided on the question of whether the defendant's request for counsel was equivocal and whether the officer needed to ask clarifying questions, the district court's ruling was affirmed

by operation of law. While certain justices wrote separate opinions, those opinions carry no precedential weight.

We are left with *Morgan,* which explicitly rejected the argument Camacho now raises. We conclude Article I, section 9 of the Iowa Constitution did not require the sergeant to ask Camacho clarifying questions to determine whether he wished to have counsel present during the interrogation.

### C. Sixth Amendment Right to Counsel

The Sixth Amendment to the United States Constitution guarantees an accused the right "to have the assistance of counsel for his defence." The right attaches upon the initiation of adversarial criminal proceedings. *State v. Peterson*, 663 N.W.2d 417, 426 (Iowa 2003). After the right attaches, the State may not deliberately elicit incriminating statements from the defendant absent counsel or a valid waiver. *Id.* (citing *Kuhlmann v. Wilson*, 477 U.S. 436, 456-61 (1986)). The relevant inquiry for our purposes is (1) had the right to counsel attached at the time of the Camacho's interrogation, and if so, (2) did Camacho effectively waive his right to counsel? *Id.* at 426.

The State's assertion notwithstanding, Camacho's right to counsel had attached at the time of the interrogation. *See State v. Johnson*, 318 N.W.2d 417, 434 (Iowa 1982) (concluding sixth amendment right to counsel attached prior to a second interview, which took place after a complaint was filed and a warrant procured at the county attorney's behest). The State filed a complaint almost three weeks before the interrogation. An attorney for Camacho filed an appearance two weeks before the interrogation. An arrest warrant on a complaint was signed by a magistrate eleven days before the interrogation.

Camacho was arrested pursuant to the warrant on the day he was interrogated. Finally, the county attorney was apprised of the investigation and provided input during its early stages. As the district court found,

> the State had made a firm decision to institute adversarial criminal proceedings against the Defendant at the time the interview was effected, and that in combination with the prosecutor's significant prior involvement in the case, the Defendant's Sixth Amendment right to counsel had attached at the time he was interviewed.

We turn to whether Camacho knowingly, intelligently, and voluntarily waived his sixth amendment right to counsel. *See Montejo v. Louisiana,* 556 U.S. 778, 786 (2009) ("Our precedents also place beyond doubt that the Sixth Amendment right to counsel may be waived by a defendant, so long as relinquishment of the right is voluntary, knowing, and intelligent.").

"[W]hen a defendant is read his *Miranda* rights (which include the right to have counsel present during interrogation) and agrees to waive those rights, that typically does the trick [under the Sixth Amendment], even though the *Miranda* rights purportedly have their source in the *Fifth* Amendment." *Id.* at 786-787. The reason for accepting the Fifth Amendment waiver in the Sixth Amendment context is as follows:

> "As a general matter . . . an accused who is admonished with the warnings prescribed by this Court in *Miranda* . . . has been sufficiently apprised of the nature of his Sixth Amendment rights, and of the consequences of abandoning those rights, so that his waiver on this basis will be considered a knowing and intelligent one."

*Id.* (quoting *Patterson v. Illinois*, 487 U.S. 285, 296 (1988)). As the Court explained:

> What matters is that these cases . . . protect the right to have counsel during custodial interrogation—which right happens to be

guaranteed (once the adversary judicial process has begun) by *two* sources of law. Since the right under both sources is waived using the same procedure, *Patterson, supra,* at 296, 108 S.Ct. 2389, doctrines ensuring voluntariness of the Fifth Amendment waiver simultaneously ensure the voluntariness of the Sixth Amendment waiver.

*Id.* at 795.

We have already found that Camacho knowingly, voluntarily, and intelligently waived his Fifth Amendment rights. Based on that conclusion, we further conclude he knowingly, voluntarily, and intelligently waived his right to counsel under the Sixth Amendment.

The real question Camacho raises is whether the waiver was valid. Citing *State v. Newsom*, 414 N.W.2d 354, 358-59 (Iowa 1987), Camacho argues the waiver was not valid because the sergeant "initiated further questioning after learning [he] was represented."

*Newsom* did indeed hold that "the State's further interrogation of the defendant, when he was represented by counsel affirmatively circumvented defendant's sixth amendment rights," nullifying "any waiver that defendant may have made." *Newsom*, 414 N.W.2d at 359. However, *Newsom* partially relied on a United States Supreme Court opinion that has since been overruled. *See Montejo*, 556 U.S. at 794-95, 797 (overruling *Michigan v. Jackson*, 475 U.S. 625 (1986)).

In *Jackson*, the United States Supreme Court held, "if police initiate interrogation after a defendant's assertion, at an arraignment or similar proceeding, of [the] right to counsel, any waiver of the defendant's right to counsel for that police-initiated interrogation is invalid." 475 U.S. at 636. The

*Montejo* Court rejected this prophylactic rule, stating: "The upshot is that even on *Jackson*'s own terms, it would be completely unjustified to presume that a defendant's consent to police-initiated interrogation was involuntary or coerced simply because he had previously been appointed a lawyer." *Montejo*, 556 U.S. at 792. The Court minced no words in holding "*Michigan v. Jackson* should be and now is overruled." *Id.* at 797. While the Court's reasoning was partially pegged to the fact that Montejo did not voluntarily elect to retain counsel but was automatically appointed counsel—which is not the case here[3]—the Court also found the prophylactic rule of *Jackson* unnecessary in light of existing Fifth Amendment protections.[4]

The Court's overruling of *Jackson* calls into question *Newsom*'s holding under the Sixth Amendment. Accordingly, we decline to rely on *Newsom'*s Sixth Amendment analysis to hold that Camacho's waiver of his Sixth Amendment right to counsel was invalid.

---

[3] The record reveals that Camacho made an election to retain counsel the day after the filing of the first complaint. The attorney was privately paid.

[4] *See generally United States v. Rojas*, 553 F. App'x. 891, 893-94 (11th Cir. 2014) ("Although he attempts to distinguish his case from *Montejo* based on the fact that he retained private counsel, rather than having an attorney appointed for him, the distinction is irrelevant. The Court in *Montejo* emphasized a defendant's ability to clearly assert, and thus sufficiently safeguard, his right to counsel at any critical stage following indictment, and it rejected the notion that the acquisition of counsel affected the ability or rendered it irrelevant. Likewise, Rojas's retention of counsel in no way limited his ability to clearly express a desire to have his attorney present for the post-arrest interview.") (internal citations omitted); Jonathan Witmer-Rich, *Interrogation and the Roberts Court*, 63 Fla. L. Rev. 1189, 1229 (2011) ("The *Montejo* Court's overruling of Jackson has dramatically opened up the doctrinal landscape. It is now unclear whether there is any Edwards-type rule in the Sixth Amendment context for a charged defendant not in custody.").

### *D. Article I, Section 10 of the Iowa Constitution Claims*

Camacho next claims the sergeant violated his right to counsel under Article I, section 10 of the Iowa Constitution by continuing to question him after he told her he had a lawyer. The Iowa Supreme Court directly addressed this issue in *Newsom*. The court stated:

> We also agree with defendant's claims *under the Iowa Constitution. Independent of our sixth amendment analysis, we find that defendant's right to counsel under the Iowa Constitution, article I, section 10, was also violated.* In so doing, we rely on our own interpretation of our state constitution. We broadly construe this provision to effectuate its purpose, which was to correct the imbalance between the position of an accused and the powerful forces of the State in a criminal prosecution. . . . An accused that is represented by counsel should not be subjected to a tug-of-war between defense counsel and agents of the State. *We hold that our constitution prohibits agents of the State from initiating any conversations or dealings with an accused concerning the criminal charge on which representation of counsel had been sought.* A violation of this prohibition by the State shall preclude any waiver, by an accused, of the right to counsel.

*Newsom*, 414 N.W.2d at 359 (emphasis added). Because the court decided the Iowa constitutional issue "independent[ly]" of its Sixth Amendment analysis, *Montejo* does not call this portion of the opinion into question. Accordingly, we agree with Camacho that the court's holding under the Iowa Constitution is directly on point and is controlling.[5]

We reach this conclusion notwithstanding the State's assertion that this court's holding in *State v. Findling*, 456 N.W.2d 3 (Iowa Ct. App. 1990) is inconsistent with *Newsom*. In *Findling*, the court was asked to decide whether a suspect's waiver of his *Miranda* rights was sufficient to waive his right to counsel

---

[5] *See State v. Bevel,* 745 S.E.2d 237, 246 (W. Va. 2013) ("[A]lthough Montejo has altered the benefits of the right to counsel on the federal level, it has not changed the right in such a way that conflicts with the right as guaranteed by [our State precedent].").

under Article I, section 10 of the Iowa Constitution. 456 N.W.2d at 6. Although the court cited *Newsom*, it did so only for the proposition that we broadly construe the state constitutional right to effectuate its purpose. *Id.* The court adopted the "rationale and ruling" of the United States Supreme Court in *Patterson v. Illinois*, 487 U.S. 285 (1988), and concluded "the *Miranda* warning sufficiently informed Findling of his right to counsel under the state constitution." 456 N.W.2d at 7.

This was not the issue in *Newsom*. There, the court was asked to decide whether the Iowa Constitution prohibited agents of the State from initiating conversations with an accused once the right to counsel attached. *Newsom*, 414 N.W.2d at 357. The court answered yes to this question. *Id.* at 359. *Findling* did not call this holding into question.

Based on *Newsom*, we conclude the sergeant violated Camacho's right to counsel guaranteed by Article I, section 10 of the Iowa Constitution when she continued to question Camacho after she learned he had a lawyer. While *Newsom* recognized an accused could elect to initiate conversation with the police after the right to counsel attached, the court imposed "a heavy standard of proof on the State to prove that the defendant initiated further conversation." 414 N.W.2d at 359. We are not convinced the State satisfied the heavy standard because the sergeant, not Camacho, initiated substantive questioning after Camacho said, "Well, I got my lawyer, but I don't know when, when I go to court. I don't know when." While she asked Camacho whether he was willing to talk, she did not receive an audible answer to this question before proceeding.

Because the sergeant initiated a substantive conversation following Camacho's disclosure that he had an attorney, the evidence of the interrogation should have been suppressed. Our conclusion would also require suppression of the apology letter dictated toward the end of the interrogation.

### E. Harmless Error

The State contends even if Camacho's federal or Iowa right to counsel was violated, the error was harmless. "To establish harmless error, the State must 'prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Peterson*, 663 N.W.2d at 431 (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)). There are two steps in the harmless error analysis:

> First, the court asks what evidence the jury actually considered in reaching its verdict. Second, the court weighs the probative force of that evidence against the probative force of the erroneously admitted evidence standing alone. This step requires the court to ask "whether the force of the evidence is so overwhelming as to leave it beyond a reasonable doubt that the verdict resting on that evidence would have been the same without the erroneously admitted evidence."

*State v. Walls*, 761 N.W.2d 683, 686-87 (Iowa 2009) (internal citations omitted).

The State was required to prove that Camacho performed sex acts with children under the age of twelve. The State called the two complaining witnesses. The younger testified that, when she was five years old, she lived with her grandmother and Camacho. She provided a detailed description of sex acts Camacho performed on her while her grandmother was at work. The older child similarly testified that Camacho performed sex acts on her when she was six to nine years old.

A physician testified the older child visited a hospital for urinary tract infections. She opined that urinary tract infections could be caused by digital penetration of the genitals and fondling, but she acknowledged the infections also could have been caused by non-criminal conduct.

This duly admitted evidence was probative of sexual abuse but, for constitutional harmless error purposes, the State is obligated to prove beyond a reasonable doubt that "there is 'no reasonable possibility' the falsely admitted statements contributed to the conviction." *Walls*, 761 N.W.2d at 688 (quoting *Peterson*, 663 N.W.2d at 434). The children testified to events occurring a decade earlier. The physician's testimony was equivocal at best.

The interrogation evidence admitted during the State's case-in-chief altered the landscape. After the sergeant deceived Camacho into believing the police had DNA evidence implicating him, Camacho said he might have inadvertently transferred his DNA to the children when he showered them following sex with his wife. He apologized for taking showers with them, washing them, and touching their private parts. While he did not confess to the crimes, his incendiary explanation could only be viewed as highly probative on the question of whether he committed sex acts with the children.

The State points out, however, that Camacho elected to testify in his defense, was impeached with his prior statement, and "substantively confirmed most of what was contained on the tape, making its admission duplicative and, thus, harmless." We recognize a statement to police taken in violation of the right to counsel can be admitted to impeach a defendant's inconsistent trial testimony. *See Michigan v. Harvey,* 494 U.S. 344, 350-51 (1990). But we are

still obligated to evaluate the probative force of the erroneously admitted evidence. *Walls*, 761 N.W.2d at 686-88. *See also People v. Polk*, 118 Cal. Rptr. 3d 876, 889 (Cal. App. 1 Dist. 2010) ("[P]rejudice should be evaluated on the basis of the evidence actually presented, while excluding the improperly admitted evidence.")

On direct examination, Camacho referred to certain potentially inculpatory portions of his prior statement but, contrary to the State's assertion, he did not "confirm" those portions. He denied taking showers with the children, denied doing anything inappropriate when he gave them baths, denied that the children slept in this bed, denied having semen on his hand and touching one of the girls, and denied having any sexual contact with either of the children. While the prosecutor impeached him with certain assertions he made in his prior statement, he only covered a fraction of the entire conversation and he may have been precluded from admitting the statement had it not already been admitted during the State's case-in-chief. *See* Iowa R. Evid. 5.608(b) (precluding admission of extrinsic evidence for impeachment purposes). We conclude the discussion of the prior statement in the defense case did not duplicate the contents of the audio recording.

As in *Walls*, the importance of Camacho's interrogation statement cannot be overstated. In closing argument the prosecutor said:

> The innocent man who is asked can you—what would you say if I told you we found your semen on these girls would say, that's a mistake. You can't possibly have found that. I have no idea what you're talking about. The guilty man tries to come up with some explanation as to, oh, they found my semen. Well, what am I gonna say?

> And he comes up off the seat of his pants with this story about having semen on his hand and touching the girls. The innocent man doesn't do that. The guilty man does.

While the prosecutor went on to characterize the statement as "extra . . . icing," he did not move to the cake. Within moments he said, "[T]he very fact that [Camacho] felt the need to explain how his semen could have been on both girls goes a long way to feeling comfortable that we are beyond his presumption of innocence based on the evidence that we have heard." He continued, "[Camacho's] the one who comes up with the showering. He's the one who's searching for an explanation as to how the semen could be there."

Based on this record, we conclude the State failed to prove the admission of the interrogation evidence during the State's case-in-chief was harmless error. We reverse and remand for a new trial. In light of our conclusion, we find it unnecessary to address the remaining issues raised by Camacho.

**REVERSED AND REMANDED.**